13479

MUNN v. PRICE *ET AL.*
CARTER v. SAME

(165 S. E., 777)

See also 160 S. C., 186, 159 S. E., 369.

*Messrs. C. B. Pearce* and *Lionel K. Legge,* for appellants,

*Messrs. T. P. Stoney* and *M. E. Crosland,* for respondent Carter; *Mr. J. D. E. Meyer,* for respondent J. C. Munn,

October 3, 1932.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

These cases arose out of the same automobile accident, were tried together in the lower Court and heard together in this Court. The case of J. C. Munn against the defendants, B. George Price, trading and doing business as the Price 'Transportation Line, and one truck bearing State of South Carolina license No. 1054 and one trailer bearing State of South Carolina license No. 1053, an action for damages for alleged personal injuries and property damage in the amount of $6,000.00, was commenced in the Court of Common Pleas for Charleston County, March 17, 1930; and the case of Dalton Carter, as plaintiff, against the same defendants, is an action for damages for personal injuries, in the sum of $6,000.00, commenced in said Court March 12, 1930. Issues being joined, answers having been filed by the defendants in each case, the cases were tried at the April, 1931, term of said Court before his Honor, Judge T. J. Mauldin, and a jury, resulting in a verdict for the plaintiffs in each case. Thereafter a motion for a new trial was made by the defendants, which motion his Honor, Judge Mauldin, refused. From the said order refusing the motion for a new trial and from the judgments entered on the verdicts, the defendants have appealed to this Court.

The errors which the appellants impute to the trial Judge are set forth under six exceptions, but, as stated in the brief of counsel for appellants, there are only five questions presented for consideration. The first, second, and third questions, as stated by appellants, which we shall consider together, are as follows:

"First: Taking into consideration all the testimony in these cases were the verdicts contrary to evidence? (Exception one.)

"Second: Was the only reasonable inference to be drawn from the testimony that the plaintiff Munn was guilty of contributory negligence? (Exception two.)

"Third: Was the only reasonable inference to be drawn from the testimony that the plaintiff Munn was acting as the agent of the plaintiff Carter in the operation of the automobile at the time of the accident and that they were engaged in a joint and common enterprise so that the negligence shown on the part of the plaintiff Munn should have defeated a recovery by both plaintiffs? (Exception three.)"

In the agreed statement of counsel set forth in the transcript of record, the following statement appears as to the facts: "On the afternoon of March 3, 1930, the truck of the defendant B. George Price was proceeding from Charleston to Walterboro, S. C., with a load of empty turpentine barrels. Coming in the opposite direction was the automobile of the plaintiff J. C. Munn, driven by him, and in which were riding three other men, among them the plaintiff, Dalton Carter. When the truck and the automobile were nearly abreast, one of the barrels fell from the truck to the concrete road and bouncing up struck the automobile, causing Munn, who was driving the automobile, to lose control, and the car after traveling some distance, ran into a ditch and was damaged and Munn and Carter sustained personal injuries."

In addition to the above agreed statement regarding the substantive facts in the case, it was alleged by both of the plaintiffs that the said truck, owned by the said B. George Price, and operated by him, his agents and servants, approached the automobile in which the plaintiffs were riding at a high and unlawful rate of speed, with barrels piled carelessly and negligently and without due regard to the safety of the traveling public, and, when the car in which the plaintiffs, in the respective cases, were riding, and the said truck were about opposite each other on the said highway, a barrel rolled off of the said truck striking the radia-

tor of the said automobile, and rebounding against the dash, caused the said automobile to swerve to the right, locking the wheels of the same so that it shot across the road to the left and into a ditch paralleling the said highway, and, as a result, caused the damages alleged. Among the specific allegations of recklessness, carelessness, willfulness, and wantonness alleged against the defendant, B. George Price, his agents and servants, in causing the alleged personal injuries and property damage, were the following:

"(a) In operating and causing to be operated the motor truck on one of the highways of the State of South Carolina, at a rate of speed greater than that authorized by the laws of the State of South Carolina, with reference to the speed of the motor trucks on the highway.

"(b) In operating, permitting, and allowing the said motor truck to be operated when loaded with empty barrels on the said highway, without taking due care and caution to prevent the said barrels from rolling, jarring and/or falling off of the said truck.

"(c) In permitting and allowing the said truck to be improperly loaded with empty barrels when the defendant, his agents and servants, knew or should have known that the said empty barrels would be jarred off or thrown off of the said truck, and thus injure other motorists using the said highway.

"(d) In failing and omitting to take any precaution or do anything whatsoever to prevent the said barrels from falling off of the said truck and thus injuring the plaintiff.

"(e) In causing, allowing, and permitting the said truck to proceed on the said highway when the defendant, his agents and servants, knew or should have known that the said truck was loaded with empty barrels in a careless, reckless manner, in that they were piled on same above frame of the body.

"(f) In causing and permitting the said truck to proceed along the said highway, when the defendant, his agents and

servants, knew or should have known that the empty barrels were improperly and dangerously placed and situated on the said truck."

The defendants, in their answer, admitted the formal allegations of the complaint but denied all of the material allegations contained therein, except those stated in the agreed statement of counsel set forth hereinabove; and alleged, in effect, that the accident referred to, and the injuries and damages resulting therefrom, were caused by the negligence and recklessness of the plaintiff, J. C. Munn, in operating the said automobile on said highway in a careless, reckless, and negligent manner, and at a rate of speed greater than that authorized by the State of South Carolina; also in failing to take due caution and drive his automobile in a manner commensurate with existing conditions, and in driving said automobile in violation of Section 581 of the Criminal Code of South Carolina, and in failing to operate the said automobile in a manner to "avoid striking the said truck without wrecking the automobile"; and, further, alleged that the injuries and damages sustained by the plaintiffs were due entirely to the gross carelessness and negligence of the said J. C. Munn, "in not diminishing the speed at which he was operating his car when he could see the truck which he alleges was carelessly and improperly loaded, and in approaching said truck at such a dangerous and reckless rate of speed, utterly failing to take any precaution for his own safety or that of his passengers, and although knowing the obvious danger of passing a truck which, as he alleges, was overloaded and the barrels in which were carelessly placed, failed to have his car under control so that when an emergency arose, due to the speed at which he was traveling, completely crossed the road, the car turning completely around, going in the ditch on the right hand side and facing in the opposite direction before he could bring it to a stop, all of which carelessness and negligence was the proximate cause of the accident or con-

tributed as a proximate cause thereto." The defendant also interposed the plea of contributory negligence; and, in the answer to the complaint in the *Carter case,* in addition to making similar allegations to those contained in the answer to the Munn complaint, alleged that all of the acts committed by Munn were concurred in by Carter, and alleged that Carter was engaged with Munn in a joint and common enterprise at the time of the alleged accident and resultant injuries and damages sustained by the plaintiffs.

The exceptions raising the issues stated above cannot be sustained, for the reason that the testimony introduced at the trial of the case, as disclosed by the transcript of record, shows clearly that an issue of fact was raised for the jury on the material questions involved in the case at the trial. Even if it be conceded that the plaintiff Munn was, at the time in question, acting as the agent of the plaintiff Carter in the operation of the automobile and that they were engaged in a joint and common enterprise, the exceptions raising this question cannot be sustained, for the reason that it does not appear conclusively that the plaintiff Munn was the cause of the alleged injuries and consequent damages. More than one reasonable inference can be drawn from the testimony as to whose negligence or recklessness caused the trouble as a proximate cause thereof. In this connection we call attention to the following testimony of the plaintiff, J. C. Munn:

"Q. When you left your place of business on that afternoon March the 3rd, 1930, was anybody driving in the automobile with you? A. Yes, sir, three other carpenters.

"Q. Who was sitting in the front seat with you? A. R. L. Antley.

"Q. Who was sitting right behind you? A. I can't answer that, I did not pay much attention.

"Q. Who was in the rear seat? A. Mr. Grayson and Mr. Carter.

"Q. Now is Mr. Grayson living or dead? A. He is dead.

"Q. The other two gentlemen who were in the automobile with you are they living? A. Yes, sir.

"Q. Now, when you left your work and came towards Charleston did anything unusual happen on your trip to Charleston that afternoon? A. Yes, sir; I was coming in from work as usual in the afternoon and when I reached about 500 yards on the west side of Meggetts School I saw a truck coming and it was loaded way up high with barrels. I could not tell at first what it was. The truck was going at a high rate of speed and by the time I could see that what was on the truck was barrels the truck was right on me and I began to get off the highway and slow down and at the same time I left the highway and started to slow down and a barrel jumped off the truck and my car caught the barrel on the radiator and threw it in my face crushing the cowl and turning the steering wheel over and locking it and causing the car to turn over I guess, I don't remember.

"Q. Were you conscious? A. I was not conscious after the barrel hit me until I crawled out of the top of the car.

"Q. Just at the time the barrel hit you what happened to the windshield? A. When the barrel crashed in to the car it busted the windshield in my face and I ducked to keep the glass out of my face and that is the last I remember until I crawled out of the ditch.

"Q. What is the cowl of the automobile? A. The front of the dash, the dash is inside of the car directly under the windshield with the instrument board and the cowl is on the outside, there is generally a dash light and two little parking lights, one on either side of the car, the cowl is where the car comes up to the front supporting the windshield. * * *

"Q. When you saw that truck loaded with barrels coming down, tell the jury how that truck was loaded? A. When I saw the truck coming I could see a tremendous bulk; I could not judge whether or not the truck was safely loaded or what it was until I was pretty close to it and as soon as

I realized the danger of the truck I began to give it the highway figuring out that it was loaded with barrels and not tied down, the barrels were not tied down, the barrels were moving around on the top you could see them above the cab of the truck, they were loaded higher than the truck, the top barrels did not have any support or protection from jumping off in the road and in less than a minute's time the barrel jumped off and that is all I knew until I crawled out of the ditch.

"Q. Where did you find yourself? A. I found myself on the north side of the road, I was on the right side coming into Charleston and when I came out of the car I was on the north side heading back to Walterboro, in the ditch.

"Q. How did you get out of the car? A. I had to crawl out through the top, there was a big hole torn in the top.

"Q. What became of the other occupants of the car? A. They were lying ten or fifteen feet from where the car settled in the ditch on the bank.

"Q. Were they injured? A. Yes, sir; all three knocked unconscious.

"Q. Now, were you the first to come to? A. Yes, sir.

"Q. What was the next thing that happened? A. The next thing that happened the driver of the truck he stopped about a hundred yards down the road I guess from us, some distance from me not right close, I saw him and motioned to him to give me aid, then I pulled the men apart they were piled on each other, one man was lying straight out this way, another across him and another with head on this gentleman's stomach.

"Q. Explain how they were lying by name. A. Mr. Antley was lying this way, straight like this, his head right by a tree, and Mr. Grayson, the deceased, he was lying across him that way.

"Q. Was he dead at that time? A. No, sir; he was living at that time but he was unconscious and Mr. Carter was lying with his head on Mr. Grayson's stomach forming a

complete cross, Grayson's back was across Antley's legs forming a complete cross like you took two pieces of lumber and made a cross out of the three men, this man's feet were down here and this man's feet over here and Antley's head here and one foot was on the side of the other man's body, they were all in together making a complete cross.

"Q. How long have you been driving an automobile? A. About 10 or 15 years, I guess.

"Q. Will you kindly tell us how fast that truck was traveling on that afternoon? A. From my judgment as a driver and judging speed, the truck must have been going between 30 and 35 miles an hour.

"Q. Would you say that it was going any less than 30 miles an hour? A. No, sir.

"Q. Was it going nearer 30 miles an hour or nearer 35 miles an hour? A. The way the barrel hit me I would judge it was going nearer 35 miles an hour.

"Q. Tell us about those barrels, what kind of barrels were they, what color were the barrels? A. They were red barrels with iron hoops, I think they are supposed to be 63-gallon barrels, oak barrels, known as the heavy oak barrels, they use them for turpentine and coca cola and soft drink syrups, they weigh around 75 pounds, as much as an ordinary man could pick up.

"Q. Did you see that barrel after you gave attention to these men? A. Yes, sir.

"Q. What was the condition of the top of the barrel? A. One hoop was knocked off on it.

"Q. Now, tell us in detail what the injuries to your automobile were. A. Well, it was completely wrecked, the motor was knocked out of line, the front wheels all out of line, the rear wheels out of line, the body was like you had taken a piece of paper and squeezed it, all smashed up, it was impossible to try to repair it, the top was torn off.

"Q. Do you know of your own knowledge whether or not your car turned over once or more times before it went

in the ditch? A. I don't know how many times it turned over.

"Q. Did it turn over? A. Undoubtedly it must have.

"Q. Now, explain to the jury about the marks on the cowl of that car showing as to what had hit it? A. There was a half-circle-like-dent on the radiator it hit the barrel where the hoops are riveted together, the hoops are riveted on those barrels and it hit where they were riveted and it dented the radiator and left the prints of the rivets and also on the cowl of the car leaving a round dent the head of the barrel hit amost straight in the cowl and windshield.

"Q. How close to the steering gear was that mark? A. That mark was right over the steering gear.

"Q. I think I omitted to ask you who was driving on that occasion? A. I was driving.

"Q. How fast were you driving immediately preceding the time that you saw this truck coming down the road? A. I judge the way I generally drive around 35 miles an hour.

"Q. When you saw this bulk coming down the road what did you do then? A. I began to use precaution. I left the highway and took my foot off the gas and applied my brake.

"Q. When you say you left the highway, what you mean is that you went on the dirt? A. Yes, sir; on the dirt portion of the road. I figured it would be better to go in the ditch than hit the barrel, I was trying to give the barrel the highway but the speed the truck was coming gave the barrel so much speed. I could not stop. I was running around 35 miles an hour and the velocity the barrel was coming at me I did not have more than 15 feet to get by and I did not have time to do anything. I would have had to stop my car in its length to stop the barrel from hitting me and that is an impossibility to stop a car running 35 miles an hour in its own length.  *  *  *

"Q. You stated that Mr. Grayson is dead. Was he killed as a result of this collision on that day? A. Yes, sir."

Under the well-recognized rule, it clearly appears from this testimony that a jury question was raised on all of the issues presented, regardless of the weight of the testimony introduced on behalf of the defendants.

We also call attention to the fact that the defendants made no motion for a nonsuit, nor did they make a motion for direction of a verdict. Rule 76 of the Circuit Court, appearing in Vol. 1 of the Code of 1932, requires that "the point that there is no evidence to support an alleged cause of action shall be first made either by a motion for nonsuit or a motion to direct the verdict." It was therefore the duty of the defendants to make a motion, during the trial of the case, in compliance with this rule, in order to be in a position to raise a question as to the insufficiency of the testimony on any issue involved, and, having failed to do so, cannot at this time be heard to complain. In this connection we call attention to the following cases: *Builders' Lumber & Supply Company v. Cheek,* 139 S. C., 299, 137 S. E., 734; *Rogers et al. v. Wunderlich et al.,* 135 S. C., 307, 133 S. E., 545; *Brown v. Piedmont Manufacturing Co.,* 109 S. C., 343, 96 S. E., 138, and *Brewer v. A. C. L. Railroad Co.,* 149 S. C., 454, 147 S. E., 596.

In this connection, appellants take the position that the Court erred in failing to grant the motion for a new trial, made after the verdicts in each case were rendered, the grounds upon which the motion for a new trial was based were as follows:

"1. That the verdict was contrary to the evidence in the case, all the testimony indicating that the plaintiffs herein were guilty of contributory negligence which should have defeated their recovery.

"2. That the amount of the verdicts in both cases was excessive."

This allegation of error is disposed of by what we have stated above in our consideration of the other questions.

The fourth question suggested by appellant is as follows: "Fourth: Was the verdict of Four Hundred Twenty-five ($425.00) Dollars for the plaintiff Munn for damages to his property improper in that it failed to state whether such damages were actual or punitive, and if actual was it not so grossly excessive as to shock the sense of justice of this Court? (Exception four.)"

It is true, as contended by appellants, the plaintiff Munn testified that he only gave $350.00 for the automobile in question, and there was also testimony to the effect that, after the car was wrecked, he received $25.00 for the wrecked car. In this connection we call attention to the fact that the car was purchased by Munn as a secondhand car, and it may be that the jury took into consideration the fact that often secondhand cars are purchased at a bargain and are actually worth more than the purchase price. It is not at all improbable that the jury placed a greater value on this car than the plaintiff actually paid for the same. In this way the difference in the purchase price and the amount fixed in the verdict may be accounted for. In our opinion, there was ample testimony to go to the jury on the question of punitive damages, and it may be that the jury intended to add in something for punitive damages on this cause of action, although they did not give any punitive damages in the other cause of action for the plaintiff Munn, or in the suit for the plaintiff Carter. While the defendants made a motion for a new trial upon the ground that the amount of the verdicts in both cases was excessive and upon the ground that the verdict in each case was contrary to the evidence, so far as the record discloses, no special or specific point was made in connection with the motion for a new trial regarding the amount fixed by the jury for the value of the car or in connection therewith. In connection with what we have said regarding this question, we, at this time, call attention to our statements in consideration of the other questions above discussed. In passing upon the motion for a new

trial and refusing the same, his Honor, the trial Judge, issued the following order:

"The above entitled cases were tried together by consent on April 21 and 22, verdict of the jury being rendered on the latter date. This matter now comes before me upon a motion for a new trial in respect to both cases.

"There was no motion for a nonsuit made at the close of the plaintiff's case; nor was there any motion made for a direction of a verdict at the close of all of the testimony. All propositions of law requested by the defendants were fully charged to the jury, and at the conclusion of the charge counsel for both plaintiff and defendants were asked whether or not there was anything further, to which they replied in the negative. After hearing counsel, I can see no grounds which would warrant me granting a new trial or in disturbing the verdict. The motion for a new trial is, therefore, refused."

In our opinion, the reasons assigned by his Honor were sufficient for refusing the motion for a nonsuit.

The fifth question raised by the appellants reads as follows: "Fifth: Were the verdicts for personal injuries in the Munn and Carter cases for actual damages so excessive and out of proportion to the injuries sustained as to show prejudice and shock the sense of justice of this Court? (Exceptions five and six.)"

We are unable to agree with this position. According to our view, there was ample evidence to support the verdicts and the amount of damages named by the jury in each case.

While we have not herein called attention to each position urged by the appellants, we have carefully considered the same, in connection with the entire record, and it is our opinion that all of the exceptions should be overruled.

It is therefore the judgment of this Court that the judgment of the lower Court be, and is hereby, affirmed.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER and BONHAM concur.